IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PROCONGPS, INC.,

    Plaintiff,

v.

SKYPATROL, LLC, STAR SENSOR, INC., JIM SCHUMACHER, LLC, JIM SCHUMACHER, and TONY RANGEL,

    Defendants.
                                      /

No. C 11-03975 SI

**CLAIM CONSTRUCTION ORDER**

On July 18, 2011, the Court held a *Markman* hearing regarding the construction of certain disputed claims in two patents owned by plaintiff. Having considered the arguments of counsel and the papers submitted, the Court construes the disputed claims as follows.

**BACKGROUND**

This is a patent infringement action filed by plaintiff ProconGPS, Inc. ("Procon") against Skypatrol, LLC ("Skypatrol"), Star Sensor Technology, Inc. ("Star Sensor"), Jim Schumacher, LLC ("Schumacher LLC"), Jim Schumacher, and Tony Rangel. Procon alleges infringement of two of its patents, U.S. Patent No. 6,025,774 ("the '774 patent"), issued on Feb. 15, 2000, and U.S. Patent No.6,249,217 ("the '217 patent"), issued on June 19, 2001 (collectively, the "patents in suit"). Defendants have filed counterclaims seeking declaratory judgment of non-infringement and invalidity of these patents, as well as unfair competition (Skypatrol only).

According to the complaint, Procon obtained non-exclusive licenses for the patents from the prior owner in March 2008, and has built a successful GPS tracking business on the technology, which

allows vehicle tracking across Procon's North America data network. Compl. (Dkt. 1) ¶¶ 14-15. Specifically, the method claimed concerns tracking vehicles in the subprime vehicle finance industry. According to Procon, the improved security of collateral in the form of the vehicle itself has allowed auto dealers and financial institutions to "offer their products and services to a dramatically wider market." *Id.* ¶ 16. Procon alleges that defendants' various products and services infringe the asserted patents, literally or under the doctrine of equivalents, directly or indirectly (through induced or contributory infringement). The patents in suit were subject to an *ex parte* reexamination request with the PTO, and on June 28, 2011, following a comprehensive analysis, the PTO issued a Certificate of Reexamination. The independent claims of the patents were amended to include the use of GPS technology as a limitation. Procon alleges that the defendants have been aware of the reexamination and the infringing status of their products, and that their infringement has been willful. *Id.* ¶¶ 21,33. For the purposes of present claim construction, Skypatrol filed a claim construction brief, while Star Sensor, Schumacher LLC, Schumacher, and Rangel jointly filed a separate brief. Therefore, each term has two proposed definitions by defendants.

The patents share the same title ("Method For Retrieving Vehicular Collateral") and written description, which describes the method as follows:

> In accordance with the present invention, there is provided a method of securing collateral for a loan when indicated by a loan status wherein the collateral is a vehicle. The method provides for installing a transmitter within the vehicle. The transmitter is capable of transmitting locational data regarding the vehicle. The loan status is monitored for a default condition. A data link is established from a base terminal to the transmitter of the vehicle upon an occurrence of the default condition in the loan status. Locational data is transmitted from the transmitter of the vehicle to the base terminal via the data link. The location of the vehicle is determined from the locational data transmitted to the base terminal. Finally, the vehicle is confiscated.

'774 (Abstract)

The independent claims of the patents were amended during the reexamination, and additional dependent claims were added. There is one independent claim in the '774 patent (disputed terms are in bold):

> 1. A method of securing collateral for a **loan** when indicated by a loan status wherein the collateral comprises a vehicle, the method comprising the steps of:
> (a) installing a transmitter within the vehicle, the transmitter being capable of transmitting **locational data** regarding the vehicle;
> (b) monitoring the loan status for a **default condition**;

2

    (c) **establishing a data link from a base terminal to the transmitter** of the vehicle **upon an occurrence of the default condition in the loan status**;
    (d) **transmitting locational data from the transmitter of the vehicle to the base terminal via the data link**;
    (e) determining the **location** of the vehicle from the **locational data** transmitted to the base terminal; and
    (f) **confiscating** the vehicle;
    wherein step (a) further comprises the step of: (1) installing a GPS positioning signal receiver; and
    wherein step (c) further comprises the step of: (1) receiving a GPS positioning signal; and
    wherein the transmitted **locational data** being based upon the received GPS positional signal.

'774, 6:39-54.

The two independent claims in the '217 patent are similar (disputed terms are in bold):

    **1.** A method of securing collateral for a **loan** when indicated by a loan status, the collateral comprises a vehicle, a transmitter capable of transmitting **locational data** regarding the vehicle is installed within the vehicle, the method comprising the steps of:
    (a) **receiving a signal in response to a change in the loan status**;
    (b) **establishing a data link from a base terminal to the transmitter upon the receipt of the signal representative of a change in the loan status**;
    (c) **transmitting locational data from the transmitter to the base terminal via the data link**; and
    (d) determining the **location** of the vehicle from the **locational data** transmitted to the base terminal for use in **confiscating** the vehicle;
    wherein a GPS positioning signal receiver is installed within the vehicle and the transmitted **locatio**[nal data being based upon the] received GPS positioning signal.

'217, 6:40-55.

Claim 15 of '217 is identical to Claim 1, except that step (b) ends with "**signal representative of the loan status being in a default condition**". '217, 8:31-32.

## LEGAL STANDARD

Claim construction is a matter of law. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372 (1996). Terms contained in claims are "generally given their ordinary and customary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312. In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Id.* at 1313; see also *Vitronics Corp. v. Conceptronic, Inc.*,

90 F.3d 1576, 1582 (Fed. Cir. 1996). "The appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); see also *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997).

Accordingly, although claims speak to those skilled in the art, claim terms are construed in light of their ordinary and accustomed meaning, unless examination of the specification, prosecution history, and other claims indicates that the inventor intended otherwise. See *Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1053 (Fed. Cir. 1994). While claims are interpreted in light of the specification, this "does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment described in the specification generally should not be read into the claim language. See *Comark*, 156 F.3d at 1187; *see also Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1314 (Fed. Cir. 2008) ("[The] description of a preferred embodiment, in the absence of a clear intention to limit claim scope, is an insufficient basis on which to narrow the claims."); *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1345-46 (Fed. Cir. 2008) (refusing to limit claim language to the disclosed embodiment in the absence on indication that the inventor meant to limit the claim language). However, it is a fundamental rule that "claims must be construed so as to be consistent with the specification." *Phillips*, 415 F.3d at 1316.

Finally, the Court may consider the prosecution history of the patent, if in evidence. *Markman*, 52 F.3d at 980. In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes. See *Vitronics*, 90 F.3d at 1583. Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. See *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583). However, it is entirely appropriate "for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id.* Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. All extrinsic evidence should be evaluated in light of the intrinsic

4

evidence. *Id.* at 1319.

## DISCUSSION

Procon argues that none of the disputed claim terms requires construction and that their plain and ordinary meaning should be used, with no further definition provided. Procon contends that the Federal Circuit requires the courts to construe a term only when the scope of the claim is in dispute, but that construction is unnecessary when meanings of common words are debated. Procon's Reply in Support of Its Brief on Claim Construction (Dkt. 73, "Reply") at 1, citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, Ltd., 521 F.3d 1351 (Fed. Cir. 2008). In *O2 Micro Int'l*, the Federal Circuit held that a "determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* at 1361.[1] Therefore, the Court will follow the Federal Circuit's guidance that claim construction "is not an obligatory exercise in redundancy" but rather "is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *Id.* at 1362 (citing *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

The parties also disagree about who is a person having ordinary skill in the art. *See Phillips*, 415 F.3d at 1312 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."). Procon cites the expert declarations submitted in support of the patent reexamination in contending that the standard should be a person with 1-2 years in the "buy here pay here" or "subprime" vehicle finance industry and that the inventor himself was a "repo man." Plaintiff's Opening Brief On Claim

---

[1] The Federal Circuit presents examples of "ordinary" words that required construction. *See, e.g.*, *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) (construing "board" in light of intrinsic record); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1350 (Fed. Cir. 2004) (construing "golden brown" even though colors "are commonly used terms with well-accepted plain definitions that rarely need construction"), *rev'd on other grounds*, 546 U.S. 394 (2006); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir.1999) (construing "cover," "included," "attachment," and "removable"). However, the Federal Circuit has also affirmed district courts' refusals to construe terms. *See, e.g.,Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (finding no error in non-construction of "melting"); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (finding no error in court's refusal to construe "irrigating" and "frictional heat").

1 Construction (Dkt. 65, "Procon Brief") at 5 (citing Ex. 3, Shilson Declaration 5-7, 19; Ex. 4, Chen
2 Declaration 10). Skypatrol argues that "a person with such minimal experience at the time of the alleged
3 invention, in 1998, would not have had a sufficient understanding of the technologies referenced in the
4 patents, including the operation of telecommunications devices and systems, as well as GPS
5 technology." Defendant Skypatrol's Responsive Claim Construction Brief (Doc. 67, "Skypatrol Brief")
6 at 4, n3. Star Sensor also argues that such a person would not have sufficient experience with "either
7 location technology or wireless communication technology." Responsive Claim Construction Brief of
8 Defendants Star Sensor, Jim Schumacher LLC, Jim Schumacher, and Tony Rangel (Doc. 69, "Star
9 Sensor Brief") at 3, n.2. The defendants do not provide an alternative standard for a person of ordinary
10 skill in the art. The method claimed in the patent, the description, and the embodiments do not provide
11 technical details beyond the general terms for the employed devices; therefore, the Court finds the
12 plaintiff's proposed standard to be proper.

13 In order to avoid redundancy in discussion, the Court has changed the order of the terms from
14 the sequence presented in the parties' briefs, so that single words are construed first, and the phrases
15 containing those terms follow.

## I. "loan"

| Term | Procon | Skypatrol | Star Sensor et al |
|---|---|---|---|
| loan<br><br>'774 Claims 1, 2, 6, 16<br>'217 Claim 1, 2, 3, 4, 5, 6, 15, 16 | plain meaning | "a purchase, lease, or rental transaction" | "a purchase, lease, or rental transaction" |

Defendants cite the following passage of the specification in support of their definition: "The vehicle 10 is used as collateral for the loan. Whether the vehicle 10 is purchased, leased or rented. . ." Star Sensor Brief at 20 and Skypatrol Brief at 16 (quoting '774, 3:1-3). Procon argues that "loan" is "as common a word as one could possibly encounter in a patent case." Reply Brief at 11. Procon also objects to equating "loan" with "transaction" because a loan continues to be monitored, while a transaction is completed at once, and therefore defendants' definition would not make sense in phrases

such as "monitoring the loan status." Further, while a loan may be part of "a purchase, lease or rental," each of these transactions can also be accomplished without a loan.

The Court agrees, and finds that the term "loan" does not require construction.

## II. "default condition"/ "delinquent condition"

| Term | Procon | Skypatrol | Star Sensor et al |
|---|---|---|---|
| default condition<br><br>'774 Claims 1, 2, 3, 4<br>'217 Claims 2, 4, 15 | plain meaning | This term renders the claims insolubly ambiguous and indefinite. | This term is indefinite pursuant to 35 U.S.C. § 112. |
| delinquent condition<br><br>'774 Claim 6<br>'217 Claim 3 | plain meaning | "a loan status wherein the loan is not paid current" | "a loan that is not paid current" |

Defendants argue that because "default" and "delinquent" are used both interchangeably and as separate terms in the patent, this renders the meaning of "default condition" insolubly ambiguous. Specifically, defendants refer to the following:

> It is contemplated that the loan status may further have a delinquent condition, wherein the loan is not paid current. The default condition is one where the loan has not been paid current for a predetermined interval. Thus, typically prior to the loan status being in a default condition, the loan status will be in a delinquent condition. '774, 4:16-21.

> The loan status may have a paid current condition and a default condition. '774, 3:18-19.

Further, defendants contend that "a predetermined interval" is ambiguous and renders "default condition" indefinite.

The Federal Circuit has held that "[b]ecause a claim is presumed valid, a claim is indefinite only if the claim is insolubly ambiguous." *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003). In *Honeywell Int'l*, the specification did not "provide sufficient clues to discern which methods are acceptable" in determining "melting point elevation." *Id.* at 1339. In contrast, in *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142 (Fed. Cir. 2004), the Circuit upheld a construction of "predetermined general direction" to mean "the flow direction must be chosen or known before

injection." *Id.* at 1150. In the present case, the specification background section provides that the terms of the loan are determined by the financial institution and agreed to by the purchaser. *See* '774, 1:12-25; 2:66-3:11. A financial institution is readily able to determine when a customer's loan is in default; no institution could function if a loan's status was "not reasonably ascertainable." *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008). To overcome the presumption of validity, which was confirmed by the PTO reexamination of asserted patents in the present case, an accused infringer must show "clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim." *Id.* Defendants have not met this burden. A person having ordinary skill in the art under all parties' standards would have some experience in the subprime vehicle finance industry, and would be able to interpret the meaning of "default condition" of a loan in accordance with the terms of the loan. Therefore, the term is not indefinite. The patent specifies that "default condition" is "when the loan has not been paid current for a predetermined interval," ('774, 4:18-19), and the Court adopts that construction. Because there is no disagreement with respect to the meaning of "delinquent condition," the Court defines "delinquent condition" as "a loan status wherein the loan is not paid current."

### III. "location data"/"location"

| Term | Procon | Skypatrol | Star Sensor et al |
|---|---|---|---|
| locational data<br><br>'774 Claims 1, 3, 4, 5, 11, 18, 19<br>'217 Claims 1, 5, 6, 7, 15, 19, 21 | plain meaning | "GPS positioning data" | "GPS coordinates" |
| location<br><br>'774 Claim 1<br>'217 Claim 1, 15 | plain meaning | "the exact physical location of the vehicle, as determined from the GPS positioning data, such that repossession personnel can find and confiscate the vehicle" | "exact physical position" |

The parties agree that the specification describes "locational data" as derivable from a GPS positioning signal. The parties also agree that amended claim 1 of the '774 patent and amended claims

8

1 and 15 of the '217 patent state that the locational data is "based on" the "received GPS positioning signal." Procon argues that this description is adequate, and "GPS position data" or "GPS coordinates" would be inappropriately limiting definitions. Star Sensor argues that "locational data" should be distinguished from "location." The Court adopts these positions and defines "locational data" as "location information based on the GPS positioning signal."

Procon argues that the defendants add unnecessary wording to the common term "location," while the defendants argue it is necessary to distinguish "location" from "locational data," quoting the description of the preferred embodiment: "[i]t is contemplated that the GPS locational data provides very precise information as to the location of the vehicle 10, and therefore facilitates the efficient determination 46 of the location and the confiscation 48 of the vehicle 10." '774, 4:66-5:3. However, "very precise" information regarding a vehicle's location is not necessarily equivalent to providing information as to a vehicle's "exact" location. Defendants do not present sufficient support to justify the inclusion of "exact" in the term, and the Court is concerned that the inclusion of "exact" could create confusion about the level of "exactness" required for an "exact" location. However, in the interest of clarity, "location" is defined as "physical position."

**IV.** **"establishing a data link from a base terminal to the transmitter"**

| Term | Procon | Skypatrol | Star Sensor |
|---|---|---|---|
| establishing a data link from a base terminal to the transmitter<br><br>'774 Claims 1, 6<br>'217 Claims 1, 15 | plain meaning | "setting up a communications link for data transmission beginning at a central server or computer system in the direction of and reaching the transmitter" | "establishing an interconnection over which information [data] can be transmitted and received, initiated from the base terminal and connecting to the transmitter" |

This discussion can be broken into several component debates, which are repeated in the disputed phrases that follow.

9

### A. "data link"

Procon argues the phrase "is clear and unambiguous on its face: a link for the transmission of data is established" and that the defendants' definitions add verbiage that introduces ambiguities. Procon Brief at 6. Procon argues that introducing language not used by the patent creates uncertainty with respect to prior art concerning telecommunications systems. Skypatrol argues that the dictionary definition provided by Procon in its Patent L.R. 4-3(b) disclosure papers confirms that "data link" means "a telecommunications link over which data are transmitted, usu. to or from a data-processing centre" (*Oxford English Dictionary*, 1st ed., Suppl. 1972, Vol. I, at 737). Skypatrol Brief at 8. Star Sensor argues that "the words 'establishing a data link' teach that a connection is established between the base terminal and the transmitter," citing the *Microsoft Press Computer Dictionary* (3d ed. 1997) ("data link" defined as "[a] connection between any two devices capable of sending and receiving information . . .") and the *Princeton University WordNet* ("data link" defined as "an interconnecting circuit between two or more locations for the purpose of transmitting and receiving data"). Star Sensor Brief at 7. Star Sensor also asserts that "information" and "data" are interchangeable. *Id.* at 7-8.

The patent provides no further information about the data link, describing only its use in transmitting different signals: "a tamper signal is transmitted in response to any sensed tampering via data link" ('774, 2:1-3); "GPS data link is established from a global positioning satellite (GPS) 24 to the GPS positioning signal receiver" ('774, 4:59-61); "the base terminal 20 may transmit a deactivation signal to the base communication receiver 16 via the data link." ('774, 6:23-24).

The parties agree that "data link" is simply a connection over which data may be sent. The Federal Circuit has long admonished courts not to make constructions that "contribute nothing but meaningless verbiage to the definition of the claimed invention." *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1152 (Fed. Cir. 1997). Neither of defendants' proposed definitions meaningfully alters the scope of "data link," and therefore the Court declines to further construe the term likely selected by the inventor for the sake of brevity.

### B. "from . . . to . . ."

Defendants argue that the words "from" and "to" require directionality in establishing the

connection, and that the establishing connection step is separate from the subsequent data transmitting step. Skypatrol Brief at 6 ("The dictionary confirms the ordinary meaning of these words: 'from' means 'beginning at' and 'to' means 'in the direction of and reaching.'" Pai Decl. Ex. E: *Webster's New World Dictionary*, 3d College ed. 1991, at 542, 1404-1405). Defendants contend that the establishing and transmitting steps, which are enumerated separately in the claims, differ in directionality because transmitting takes place from the vehicle to the base, while establishing the link should be construed as initiated by the base terminal. Defendants argue that the terms "from" and "to" are used in a directional sense when the inventor describes the transmission of locational data, because the locational data can only originate at the vehicle, and therefore, the same terms must have a directional meaning in the establishing connection step. Procon responds that Figure 2 of the patent describes step 34 as "Establish Data Link *Between* Base Terminal and Transmitter/Receiver" and therefore that directionality is not required (emphasis added).

The preferred embodiment envisions the establishing connection step as follows:

> Upon the loan status being in a default condition 32, the base terminal 20 originates and transmits 36 a transmit request signal. The base communication receiver 16 is configured to receive the transmit request signal from the base terminal 20. Thus, a data link is established 34 between the base terminal 20 and retrieval apparatus 12 disposed within the vehicle 10. The base communication receiver 16 receives 38 the transmit request signal and the controller 18 processes the transmit request signal. In response, the controller 18 initiates the transmitter 14 to transmit 42 locational data of the vehicle 10 to the base terminal 20 via the data link. '774, 4:4-15.

However, the preferred embodiment also envisions a scenario where the transmitter initiates a data link when it has been tampered with:

> In this respect, the retrieval apparatus 12 and/or components thereof (e.g., transmitter 14, base communication receiver 16, GPS positioning signal receiver 22, etc.) are configured to be capable of sensing any physical tampering therewith and transmitting a tamper signal in response to any sensed tampering. Thus, the data link is established 34 from the base terminal 20 to the transmitter 14 upon the sensing 54 of any physical tampering with the retrieval apparatus 12. '774, 5:29-37.

In this scenario, although the same "from the base terminal to the transmitter" phrase is used, it is only the transmitter that can sense it is being tampered with, and therefore, it is the transmitter that

11

initiates the data link. In order to disavow claim scope, the specification must contain "expressions of manifest exclusion or restriction." *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009). The Court finds that there is no "clear intention to limit claim scope" with respect to directionality in establishing the connection. *See Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1314 (Fed. Cir. 2008) (a "description of a preferred embodiment, in the absence of a clear intention to limit claim scope, is an insufficient basis on which to narrow the claims").

### C. "base terminal"

The parties disagree about what may qualify as a "base terminal." Procon argues that "base terminal" does not require construction, noting that "the base terminal 20 may additionally be mobile and directionally receive the transmitted signals." (quoting '774, 4:48-50). Skypatrol argues that "while the specification does not explicitly define the term 'base terminal,' the drawing in Figure 1 clearly depicts the base terminal as a computer." Skypatrol Brief at 8. The Federal Circuit has consistently advised against limiting claims to preferred embodiments shown in the figures. *See Playtex, Inc. v. Proctor & Gamble Co.*, 400 F.3d 901, 907 (Fed.Cir.2005) ("By its reliance on the figures, the district court improperly limited claim 1 to a preferred embodiment."). Therefore, the Court declines to adopt Skypatrol's position.

Accordingly, the Court construes "establishing a data link from a base terminal to the transmitter" as "establishing a data link between a base terminal and the transmitter."

**V.** **"transmitting locational data from the transmitter of the vehicle to the base terminal via the data link" / "transmitting locational data from the transmitter to the base terminal via the data link"**

| Term | Procon | Skypatrol | Star Sensor et al |
|---|---|---|---|
| transmitting locational data from the transmitter of the vehicle to the base terminal via the data link<br>'774 Claims 1 | plain meaning | "transmitting locational data from the transmitter of the vehicle to the central server or computer system over the communications link previously established in step (c)" | "transmitting locational data, GPS coordinates, from the transmitter of the vehicle to the base terminal via the interconnection previously established in step (c)" |
| transmitting locational data from the transmitter to the base terminal via the data link<br><br>'774 Claims 3, 4<br>'217 Claims 1, 15 | plain meaning | "transmitting locational data from the transmitter to the central server or computer system over the communications link previously established in step (b)" | "transmitting locational data, GPS coordinates, from the transmitter to the base terminal via the interconnection previously established in step (b)" |

Defendants argue that the data link used for the transmitting step is the data link established in the previous step in the patent. Procon does not dispute this interpretation of the claims. Reply Brief at 5 ("data is sent from the transmitter in the vehicle to the base terminal via the previously established data link"). Procon disputes the proposed definitions of "data link," "base terminal," and "locational data" as addressed *supra*. The Court finds it reasonable to append "previously established" to the data link as this is not disputed.

Accordingly, "transmitting locational data from the transmitter of the vehicle to the base terminal via the data link" is defined as "transmitting locational data from the transmitter of the vehicle to the base terminal via the previously established data link." "Transmitting locational data from the transmitter to the base terminal via the data link" is defined as "transmitting locational data from the transmitter to the base terminal via the previously established data link."

13

### VI. "upon an occurrence of the default condition in the loan status"

| Term | Procon | Skypatrol | Star Sensor et al |
|---|---|---|---|
| upon an occurrence of the default condition in the loan status<br><br>'774 Claims 1, 2 | plain meaning | "at the time of and as a result of an occurrence of the default condition in the loan status" | "as a result of the loan status entering a default condition". |

The central dispute with this term is whether "upon" requires causality or simply indicates sequentiality.[3] Defendants argue that "upon" should be construed as "only if," that is, "[i]f the default condition does not occur, then step (c) [transmitting locational data] is not performed – instead, the method continues monitoring the loan status in step (b). The data link is not established unless and until the default condition in the loan status occurs." Skypatrol Brief at 9. Defendants argue that transmission of locational data must take place only after there has been a change in the loan status, rather than potentially occurring at other times.

The Court disagrees with defendants' proposed construction. There are numerous instances where the specification describes establishing a data link without a change in the loan status having taken place. For example,

> Preferably, the data link is established at predetermined intervals and locational data from the transmitter to the base terminal is transmitted via the data link to verify the operation of the transmitter. In addition, the transmitter is capable of sensing any physical tampering therewith and a tamper signal is transmitted in response to any sensed tampering via data link. '774, 1:64-2:3.

The preferred embodiment discusses transmitter operation verification and device tampering signals in detail, and thus the intrinsic evidence indicates that the inventor did not intend for "upon" to mean that the only time a data link may be established is when there has been a change in the loan status. *See On-Line Techs., Inc. v. Bodenseewerk Perkin–Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'"). Defendants fault Procon for citing a definition of "upon" designated as obsolete. However,

---

[3] Defendants also contend that "default condition" is indefinite, as addressed *supra*.

a modern definition of "upon" in the *Oxford English Dictionary* is "immediately after; following on." (Second ed., 1989; online version June 2012). The Court defines "upon an occurrence of the default condition in the loan status" as "following an occurrence of the default condition in the loan status."

## VII. "receiving a signal in response to a change in loan status"

| Term | Procon | Skypatrol | Star Sensor et al |
|---|---|---|---|
| receiving a signal in response to a change in loan status<br><br>'217 Claims 1, 15 | plain meaning | "receiving an electrical [electronic] communication containing data indicating that the loan status has changed." | "receiving an electronic [electrical] communication that indicates the loan status has changed" |

Defendants assert that their proposed language "accounts for the fact that the signal indicates that the loan status has changed." Star Sensor Brief at 11; *see also* Skypatrol Brief at 14. It appears that defendants would like to replace "in response to" with "indicating" to simplify the grammatical construction, and defendants agree with each other that the signal may be an electronic or electrical communication.

Procon contends that the received signal is in response to a change in loan status, but that the signal need not contain any information about the loan status itself. Therefore, Procon argues that the signal must not be construed as "indicating" something about the loan. Procon also objects to replacing the term "signal" with ambiguous synonyms, noting that in the specification "signals" may include transmission via electromagnetic digital signals or radio frequency signals. Procon Brief at 12 ("Such signals are distinct electromagnetic digital signals which may be RF signal, for example." '217, 3:53-55). Procon also notes that the Federal Circuit has favored a broad interpretation of the term "signal." *See e.g., SuperGuide Corp. v. DirecTV Enters.*, Inc., 358 F.3d 870, 878-80 (Fed. Cir. 2004) (finding district court erred in construing term "signal" to exclude digital signals, even when no televisions using digital signals existed as of filing date).

15

The Court agrees with Procon that defendants' proposed constructions are not supported by the specification and unnecessarily narrow the scope of the claim term. Accordingly, the Court finds that defendants have not adequately shown what is to be gained from their proposed constructions, and the Court declines to construe this term.

**VIII. "upon the receipt of the signal representative of a change in the loan status" / "upon the receipt of the signal representative of the loan status being in a default condition"**

| Term | Procon | Skypatrol | Star Sensor et al |
|---|---|---|---|
| upon the receipt of the signal representative of a change in the loan status<br><br>'217 Claim 1 | plain meaning | "at the time of and as the result of the receipt of the electrical communication containing data indicating that the loan status has changed" | "as a result of receiving an electronic communication that indicates the loan status has changed" |
| upon the receipt of the signal representative of the loan status being in a default condition<br><br>'217 Claims 15 | plain meaning | "at the time of and as the result of receipt of the electrical communication containing data indicating that the loan status is in a default condition" | "as a result of receiving an electronic communication that indicates the loan status is in a default condition" |

This term presents the same disputes about the meaning of "upon" and "signal" discussed *supra*.[4] For the reasons discussed *supra*, the Court defines "upon" as "following," and declines to construe "signal." Defendants also assert that the use of "indicates" in the proposed constructions "brings clarity to the terms that will assist a lay audience." Star Sensor Brief at 13. The problem with using "indicates" or "indicating" with "loan status" has also been discussed *supra*. The Court finds that the defendants have not provided sufficient support for their proposed definitions to require construction of this term.

---

[4] Defendants also contend that "default condition" is indefinite, as addressed *supra*.

### IX. "confiscating"

| Term | Procon | Skypatrol | Star Sensor et al |
|---|---|---|---|
| confiscating<br><br>'774 Claim 1<br>'217 Claims 1, 15 | plain meaning | "physically repossessing or retrieving" | "taking physical possession of" |

Defendants argue that "confiscating" means physically repossessing, while Procon argues that "confiscating or repossessing," which is used throughout the specification, indicates that the two terms are different. Procon's argument that "or" indicates "stating alternatives" is persuasive. *See Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1331 (Fed. Cir. 2001). However, the dictionary definitions of "confiscate" cited by Procon also require some means of either "seizing" or "taking away."[5] The patent's written description also repeatedly suggests a connection between physical location and confiscating:

> It is contemplated that the GPS locational data provides very precise information as to the location of the vehicle 10, and therefore facilitates the efficient determination 46 of the location and the confiscation 48 of the vehicle 10. '774, 4:65-5:4.

The specification suggests that confiscation may fall along the spectrum that may or may not require physically moving the vehicle:

> Whether the vehicle 10 is purchased, leased or rented, it is understood that the party seeking to secure, confiscate, repossess or otherwise seize the vehicle may be a bank, savings and loan, mortgage company, credit union, vehicle dealership, vehicle manufacturer, leasing agent, collection agency, or any other lending/financial institution and agents thereof. '774, 3:2-8.

Therefore, the Court construes "confiscating" as "seizing," which may or may not require transporting the vehicle at the time.

---

[5] "Deprived of property as forfeited. To take away by exercise of authority from the individual (what belongs to him). To seize as if by authority; to take forcible possession of to appropriate summarily." *The Oxford English Dictionary*, 1st ed. 1933, Vol. II, p. 808); "To seize by or as if by authority." *Webster's Ninth New Collegiate Dictionary*, 1991, p. 275., Pl.'s L.R. 4-3(b) Proposed Constructions (Dkt 51, Ex. F) at 11.

17

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court adopts the constructions set forth above.

**IT IS SO ORDERED.**

Dated: August 9, 2012

_____
SUSAN ILLSTON
United States District Judge